# UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

_____

SUE ANN ADAMS, PATRICIA J. PETTENGER,
AND MARLA K. SNEAD,

*Plaintiffs - Appellants*,

v.

U.S. BANCORP, BENEFITS ADMINISTRATION
COMMITTEE, JOHN/JANE DOES, 1-5,

*Defendants - Appellees*.

_____

On Appeal from the United States District Court
for the District of Minnesota
Hon. Nancy E. Brasel
No. 0:22-cv-00509-NEB-LIB

_____

## PLAINTIFFS-APPELLANTS' OPENING BRIEF

_____

Louis M. Bograd
MOTLEY RICE LLC
401 9th Street, N.W., Ste. 630
Washington, D.C. 20004
Telephone: (202) 232-5504

Mathew P. Jasinski
MOTLEY RICE LLC
20 Church St., 17th Floor
Hartford, CT  06103
Telephone: (860) 882-1681

*Counsel for Plaintiffs-Appellants*

# SUMMARY OF THE CASE AND ORAL ARGUMENT STATEMENT

Plaintiffs-Appellants are early retirees under U.S. Bank's defined-benefit pension plan. ERISA requires that participants who retire before age 65 receive "the actuarial equivalent" of the benefit they would receive at normal retirement age. 29 U.S.C. §1054(c)(3). U.S. Bank reduced Plaintiffs' early retirement benefits using fixed early commencement factors (ECFs) adopted in 2002. Plaintiffs' expert, a Fellow of the Society of Actuaries, opined that the Plan's ECFs do not produce actuarially equivalent benefits because they are not consistent with ECFs calculated using reasonable actuarial assumptions. The district court excluded the expert's testimony on reliability grounds because he (1) used Treasury assumptions that were not mandatory and (2) failed to generate a range of competing ECFs rather than a single baseline. Having excluded Plaintiffs' expert, and because it held that actuarial equivalence does not require reasonable assumptions in any event, the district court granted summary judgment. The court also denied class certification based solely on issues affecting a subset of participants that Plaintiffs proposed to exclude.

Plaintiffs-Appellants request oral argument (30 minutes) because this appeal raises a question of statutory interpretation that has practical importance to retirees across the country. Allowing employers to use any assumptions they want when calculating early retirement benefits would result in early retirement benefits that are not the "actuarial equivalent" of normal retirement benefits, in violation of ERISA.

i

Appellate Case: 26-1330     Page: 2     Date Filed: 05/01/2026 Entry ID: 5635238

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 28(a)(1) and Eighth Circuit Local Rule 26.1A, Plaintiffs-Appellants Sue Ann Adams, Patricia J. Pettenger, and Marla K. Snead respectfully submit the following Corporate Disclosure Statement:

Each Plaintiff-Appellant is a natural person. Accordingly, there are no corporate disclosures required for these individuals.

Appellate Case: 26-1330    Page: 3    Date Filed: 05/01/2026 Entry ID: 5635238

**TABLE OF CONTENTS**

SUMMARY OF THE CASE AND ORAL ARGUMENT STATEMENT ............. i

CORPORATE DISCLOSURE STATEMENT ....................................................... ii

TABLE OF CONTENTS ............................................................................................ iii

TABLE OF AUTHORITIES ....................................................................................v

STATEMENT OF JURISDICTION .......................................................................1

STATEMENT OF ISSUES .....................................................................................1

STATEMENT OF THE CASE ................................................................................3

    I.      Statutory Background ...........................................................................3

    II.     Factual Background ..............................................................................5

        A.     U.S. Bank offers a defined-benefit pension plan. .......................5

        B.     The Plan offers early retirement benefits, reduced by early commencement factors (ECFs) based on unknown assumptions. ..................................................................................5

        C.     Plaintiffs' actuary opined that the Plan's ECFs are not consistent with reasonable actuarial assumptions .......................8

        D.     Defendants' actuary opined that the Plan's ECFs fall within a reasonable range ...........................................................12

    III.    Procedural History ..............................................................................14

    IV.    Rulings Presented for Review .............................................................16

        A.     *Daubert* and Summary Judgment Motions ...............................16

        B.     Denial of Class Certification ......................................................18

SUMMARY OF ARGUMENT ...............................................................................18

ARGUMENT ............................................................................................................21

        Standards of Review .................................................................................21

Appellate Case: 26-1330    Page: 4    Date Filed: 05/01/2026 Entry ID: 5635238

I. An ECF must be consistent with reasonable actuarial assumptions...22

    A. Statutory Language ................................................................23

    B. Legislative History................................................................27

    C. Administrative Interpretations ..................................................27

    D. Caselaw .................................................................................29

II. The district court wrongly excluded expert testimony that the Plan's ECFs are not consistent with reasonable actuarial assumptions. ......................................................................................32

    A. Altman's methodology reliably assessed whether the Plan provides actuarially equivalent benefits. ..........................33

    B. The district court erred in faulting Altman's selection of §417(e) segment rates. ..............................................................35

    C. The district court erred in requiring Altman to identify a range of early commencement factors. ....................................43

III. The district court erred by granting summary judgment.....................48

    A. The Plan's early commencement factors must be consistent with reasonable actuarial assumptions....................49

    B. The evidence shows that the Plan's early commencement factors are not consistent with reasonable actuarial assumptions.............................................................................51

    C. Defendants' failure to use reasonable actuarial assumptions also violates their fiduciary duties under ERISA. ..................................................................................54

IV. The district court erred by denying class certification.........................54

CONCLUSION................................................................................................57

CERTIFICATE OF COMPLIANCE...................................................................58

CERTIFICATE OF SERVICE ..........................................................................59

iv

Appellate Case: 26-1330    Page: 5    Date Filed: 05/01/2026 Entry ID: 5635238

# TABLE OF AUTHORITIES

## Cases

*Adams v. U.S. Bancorp*,
    635 F.Supp.3d 742 (D. Minn. 2022) ........................................... 14, 23, 26, 49

*Alessi v. Raybestos-Manhattan, Inc.*,
    451 U.S. 504 (1981)................................................................................3

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)........................................................................ 21, 52

*Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.*,
    125 F.3d 1176 (8th Cir. 1997) ...........................................................52

*Berger v. Xerox Corp. Ret. Income Guar. Plan*,
    338 F.3d 755 (7th Cir. 2003)...............................................................8

*C.I.R. v. Keystone Consol. Indus., Inc.*,
    508 U.S. 152 (1993)..............................................................................4

*Central Laborers' Pension Fund v. Heinz*,
    541 U.S. 739 (2004)............................................................................28

*Cody v. City of St. Louis*,
    103 F.4th 523 (8th Cir. 2024) ............................................................56

*Contilli v. Loc. 705 Int'l Bhd. of Teamsters Pension Fund*,
    559 F.3d 720 (7th Cir. 2009) ...........................................................4, 5

*Corning Glass Works v. Brennan*,
    417 U.S. 188 (1974)...................................................................... 49, 50

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)..................................................................... passim

*Dooley v. American Airlines, Inc.*,
    797 F.2d 1447 (7th Cir. 1986) ..................................................30, 31, 40

*Dooley v. American Airlines, Inc.*, No. 81-cv-6770,
    1993 WL 460849 (N.D. Ill. Nov. 4, 1993)..........................................31

Appellate Case: 26-1330    Page: 6    Date Filed: 05/01/2026 Entry ID: 5635238

*Duffy v. Anheuser-Busch Cos., LLC*,
    449 F.Supp.3d 882 (E.D. Mo. 2020) ...............................................................30

*Duncan v. Walker*,
    533 U.S. 167 (2001)........................................................................................25

*Esden v. Bank of Boston*,
    229 F.3d 154 (2d Cir. 2000) .......................................................................4, 26

*Greater St. Louis Constr. Laborers Welfare Fund v. RoadSafe Traffic Sys.*,
    55 F.4th 609 (8th Cir. 2022) ............................................................................3

*Harrod v. Farmland Mut. Ins. Co.*,
    346 F.3d 1184 (8th Cir. 2003) .......................................................................21

*In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*,
    9 F.4th 768 (8th Cir. 2021) ............................................................................32

*In re Wholesale Grocery Prods. Antitrust Litig.*,
    946 F.3d 995 (8th Cir. 2019) .........................................................................21

*Johnson v. Mead Johnson & Co., LLC*,
    754 F.3d 557 (8th Cir. 2014) .................................................................. 42, 46

*Kiemele v. Soo Line R.R.*,
    93 F.3d 472 (8th Cir. 1996) ...........................................................................21

*Laurent v. PricewaterhouseCoopers LLP*,
    794 F.3d 272 (2d Cir. 2015) ................................................................... 30, 51

*Lauzon v. Senco Prods., Inc.*,
    270 F.3d 681 (8th Cir. 2001) .........................................................................21

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024)........................................................................................29

*McDaniel v Chevron Corp.*,
    203 F.3d 1099 (9th Cir. 2000) ......................................................................8, 30

*McGuire v. Metro. Life Ins. Co.*, No. 12-cv-10797,
    2014 WL 3894363 (E.D. Mich. Aug. 8, 2014) ...............................................9

*Miller v. Xerox Corp. Ret. Income Guar. Plan*,
    464 F.3d 871 (9th Cir. 2006) .........................................................................25

vi

Appellate Case: 26-1330    Page: 7    Date Filed: 05/01/2026 Entry ID: 5635238

*Pizza Pro Equip. Leasing, Inc. v. Comm'r of Internal Revenue*,
147 T.C. 394 (T.C. 2016) .................................................................23

*Pizza Pro v. Comm'r Equip. Leasing, Inc. v. Comm'r of Internal Revenue*,
719 Fed.App'x 540 (8th Cir. 2018) .................................................32

*Reichert v. Kellogg Co.*,
170 F.4th 473 (6th Cir. 2026) ...................................... 6, 23, 25

*Riedl v. Gen. Am. Life Ins. Co.*,
248 F.3d 753 (8th Cir. 2001) .........................................................48

*Sec. & Exch. Comm'n v. Life Partners Holdings, Inc.*,
854 F.3d 765 (5th Cir. 2017) .........................................................37

*Stephens v. U.S. Airways Group, Inc.*,
644 F.3d 437 (D.C. Cir. 2011)................................................ passim

*Urlaub v. CITGO Petroleum Corp.*,
348 F.R.D. 319 (N.D. Ill. 2024) ....................................................47

*Urlaub v. CITGO Petroleum Corp.*,
750 F.Supp.3d 863 (N.D. Ill. 2024)........................... 36, 40, 53, 54

**Statutes**

26 U.S.C. §417(e) ................................................................. 10, 16

26 U.S.C. §417(e)(2)........................................................................10

26 U.S.C. §417(e)(3)............................................... 10, 35, 36, 40

26 U.S.C. §417(e)(3)(B) ................................................... 19, 34

26 U.S.C. §417(e)(3)(C) ................................................... 11, 34

28 U.S.C. §1291.................................................................................1

28 U.S.C. §1331.................................................................................1

29 U.S.C. §1002(23)(A)....................................................................3

29 U.S.C. §1053...........................................................................3, 28

29 U.S.C. §1053(a) ...........................................................................4

Appellate Case: 26-1330    Page: 8    Date Filed: 05/01/2026 Entry ID: 5635238

29 U.S.C. §1054 ..............................................................................3, 28

29 U.S.C. §1054(c)(3) ............................................................... passim

29 U.S.C. §1054(g)(2)(A) ....................................................................5

29 U.S.C. §1056 ...............................................................................28

29 U.S.C. §1056(a)(3) ......................................................................28

29 U.S.C. §1102(b)(4) .........................................................................6

29 U.S.C. §1132(e) ..............................................................................1

29 U.S.C. §1202(c) ..........................................................................28

## Rules

Fed. R. Civ. P. 23(a) .......................................................................56

Fed. R. Civ. P. 23(c)(1)(C) .............................................................56

Fed. R. Civ. P. 56 ...........................................................................21

Fed. R. Civ. P. 56(a) .......................................................................48

Fed. R. Evid. 702(a) ........................................................................16

Fed. R. Evid. 702(b) ........................................................................16

Fed. R. Evid. 702(c) ........................................................ 2, 16, 32, 42

Fed. R. Evid. 702(d) ........................................................................16

## Regulations

26 C.F.R. §1.401(a)(4)-12 ........................................................ 17, 50

26 C.F.R. §1.401(a)-14 ...................................................................29

26 C.F.R. §1.401(a)-14(c)(2) ..........................................................29

26 C.F.R. §1.411(a)(13)-1(b)(3) .....................................................36

26 C.F.R. §1.411(a)-4(a) .................................................................29

26 C.F.R. §1.411(a)-7(c)(6) ...............................................................5

viii

Appellate Case: 26-1330     Page: 9     Date Filed: 05/01/2026 Entry ID: 5635238

26 C.F.R. §1.417(e)-1(d)(2) ..................................................................11

26 C.F.R. §1.417(e)-1(d)(3) .............................................................. 11, 40

26 C.F.R. §1.417(e)-1(d)(6) ..................................................................35

41 Fed. Reg. 42,651 (Sept. 28, 1976) ....................................................29

42 Fed. Reg. 42,339 (Aug. 23, 1977)......................................................29

88 Fed. Reg. 72,357 (Oct. 20, 2023).......................................................13

89 Fed. Reg. 2127 (Jan. 12, 2024) ..................................................... 34, 39

## Other Authorities

Am. Academy of Actuaries, Pension Practice Council, *Alternatives to the 30-Year Treasury Rate* (July 17, 2002), *available at* https://www.actuary.org/wp-content/uploads/2025/05/AAA_17FS_Final.pdf............................................40

Br. for the Acting U.S. Sec'y of Lab. as Amicus Curiae, *Drummond v. S. Co. Servs., Inc.*, No. 24-12773 (11th Cir. Dec. 4, 2024)......................................29

Jeff L. Schwartzmann & Ralph Garfield, Educ. & Exam. Comm. of the Soc'y of Actuaries, *Actuarially Equivalent Benefits*, *available at* https://perma.cc/XKD8-FDLW ...................................................... 23, 25, 50

Ret. Income Sec. for Emps. Act, 1972: Hearings Before the Subcomm. on Labor of the S. Comm. on Labor & Pub. Welfare, 92d Cong., 2d Sess. pt. 3 (1972)......................................................................................................27

Rev. Rul. 79-90, 1979-1 C.B. 155 .........................................................42

S. Rep. No. 93-127, at 4853 (1974) .......................................................27

Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085 (1986)...........................31

The Pension Protection Act of 2006, Pub. L. No. 109-280, 120 Stat. 780 (2006) .................................................39

William W. Feller & Paul H. Jackson, *Noninsured Pension Mortality: The UP-1984 Mortality Table*, 25 *The Proceedings* 456 (1975) ................................30

Appellate Case: 26-1330    Page: 10    Date Filed: 05/01/2026 Entry ID: 5635238

# STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction under 29 U.S.C. §1132(e) and 28 U.S.C. §1331 because Plaintiffs-Appellants ("Plaintiffs") asserted claims created by a federal statute, the Employee Retirement Income Security Act of 1974 ("ERISA"). This Court has appellate jurisdiction under 28 U.S.C. §1291. The district court granted Defendants-Appellees' ("Defendants" or "U.S. Bank") motion for summary judgment and entered final judgment on January 17, 2026. App.1393; R.Doc.223, at 1. Plaintiffs filed a timely Notice of Appeal on February 13, 2026. App.1395; R.Doc.225, at 1.

# STATEMENT OF ISSUES

1. Whether the district court erred in concluding that 29 U.S.C. §1054(c)(3) does not require the use of reasonable actuarial assumptions to determine whether early retirement benefits are actuarially equivalent to the annual benefit commencing at normal retirement age.

**Most apposite cases:**

*Dooley v. American Airlines, Inc.*,
797 F.2d 1447 (7th Cir. 1986)

*McDaniel v. Chevron Corp.*,
203 F.3d 1099 (9th Cir. 2000)

*Pizza Pro Equip. Leasing, Inc. v. Comm'r of Internal Revenue*,
147 T.C. 394 (T.C. 2016), *aff'd* 719 Fed.App'x 540 (8th Cir. 2018)

*Reichert v. Kellogg Co.*,
170 F.4th 473 (6th Cir. 2026).

1

Appellate Case: 26-1330     Page: 11     Date Filed: 05/01/2026 Entry ID: 5635238

**Most apposite statutes:**

29 U.S.C. §1054(c)(3); 29 U.S.C. §1056(a).

2. Whether the district court erred in excluding Plaintiffs' actuarial expert under Federal Rule of Evidence 702(c) where his methodology assessed the plan's "early commencement factors" with reference to reasonable actuarial assumptions based on standard actuarial methodologies.

**Most apposite cases:**

*In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*,
9 F.4th 768 (8th Cir. 2021)

*Johnson v. Mead Johnson & Co., LLC*,
754 F.3d 557 (8th Cir. 2014)

*Sec. & Exch. Comm'n v. Life Partners Holdings, Inc.*,
854 F.3d 765 (5th Cir. 2017)

*Urlaub v. CITGO Petroleum Corp.*,
348 F.R.D. 319, 327 (N.D. Ill. 2024).

**Most apposite statute:**

26 U.S.C. §417(e)(3).

3. Whether the district court erred in granting summary judgment because there are genuine issues of material fact regarding whether the plan's "early commencement factors" do not generate early retirement benefits that are the actuarial equivalent of the annual benefit commencing at normal retirement age.

**Most apposite cases:**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)

2

*Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.*,
  125 F.3d 1176 (8th Cir. 1997)

*Laurent v. PricewaterhouseCoopers LLP*,
  794 F.3d 272 (2d Cir. 2015)

*Riedl v. Gen. Am. Life Ins. Co.*,
  248 F.3d 753 (8th Cir. 2001).

4.     Whether the district court erred by denying class certification on grounds exclusive to a subgroup of class members without addressing Plaintiffs' alternative request to certify a narrower class.

**Most apposite case:**

*Cody v. City of St. Louis*,
  103 F.4th 523 (8th Cir. 2024).

## STATEMENT OF THE CASE

### I.     Statutory Background

Congress enacted ERISA to establish "uniform standards and requirements for employee benefits plans." *Greater St. Louis Constr. Laborers Welfare Fund v. RoadSafe Traffic Sys.*, 55 F.4th 609, 612 (8th Cir. 2022). Among other things, ERISA prescribes minimum vesting and accrual standards. *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 510 n.5 (1981). Relevant here, 29 U.S.C. §§1053 and 1054 protect a participant's "accrued benefit," which ERISA defines as an "annual benefit commencing at normal retirement age." 29 U.S.C. §1002(23)(A). The "accrued benefit" is the "fixed periodic payment" a participant is entitled to receive starting at age 65, the amount of which "usually depends upon prior salary and years

3

of service." *C.I.R. v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 154 (1993). If a participant's accrued benefit is "determined as an amount other than" the age-65 benefit, then 29 U.S.C. §1054(c)(3) requires that it "shall be the actuarial equivalent" of the age-65 benefit. ERISA guarantees a participant a "nonforfeitable right" to this accrued benefit. 29 U.S.C. §1053(a).

Congress did not define "actuarial equivalent," but rather "intended that term of art to have its established meaning." *Stephens v. U.S. Airways Group, Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011). "Two modes of payment are actuarially equivalent when their present values are equal under a given set of actuarial assumptions." *Id*. Put another way:

> (1) the accrued benefit under a defined benefit plan must be valued in terms of the annuity that it will yield at normal retirement age; and (2) if the benefit is paid at any other time (*e.g.,* on termination rather than retirement) or in any other form (*e.g.,* a lump sum distribution, instead of annuity) it must be worth at least as much as that annuity.

*Esden v. Bank of Boston*, 229 F.3d 154, 163 (2d Cir. 2000). Thus, when a participant commences benefits before or after age 65, a plan must make a "suitable actuarial adjustment" to their benefit amount to ensure they do not forfeit benefits. *See Contilli v. Loc. 705 Int'l Bhd. of Teamsters Pension Fund*, 559 F.3d 720, 722 (7th Cir. 2009). "[O]therwise the value of the pension is lower than one that begins on the normal retirement date, and a reduction in the total value of all monthly benefits is a kind of

4

Appellate Case: 26-1330     Page: 14     Date Filed: 05/01/2026 Entry ID: 5635238

forfeiture." *Id.* Actuarial equivalence is a floor, not a ceiling.[1] The question in this case is whether U.S. Bank fell below it.

## II.   Factual Background

### A.   U.S. Bank offers a defined-benefit pension plan.

U.S. Bank sponsors a defined-benefit pension plan for its employees (the "Plan"). App.69; R.Doc.42, at 7 ¶26. The Plan is the result of the 2002 merger of three predecessor plans. App.102-03; R.Doc.87-4, at 1-2. The Plan uses the term "Part A" to describe the benefits accrued before the merger. App.102-03; R.Doc.87-4, at 1-2. After the merger, the Plan began using an accrual formula. These are "Part B" benefits. App.102-03; R.Doc.87-4, at 1-2. New employees subsequently began accruing benefits in a cash-balance plan. App.70; R.Doc.42, at 8 ¶29. These are "Part C" benefits. App.102-03; R.Doc.87-4, at 1-2. Plaintiffs' claims concern the early retirement reductions to their Part B benefits.

### B.   The Plan offers early retirement benefits, reduced by early commencement factors (ECFs) based on unknown assumptions.

Part B benefits accrue as a single-life annuity ("SLA") commencing at age 65 (the Plan's normal retirement age), and that age-65 SLA is the participant's "accrued benefit" for ERISA purposes. App.215; R.Doc.168-1, at 12; Add.88; App.606;

---

[1] Employers are permitted to offer early pension benefits that are more generous than the actuarial equivalent of the standard pension benefit. *See* 29 U.S.C. §1054(g)(2)(A); 26 C.F.R. §1.411(a)-7(c)(6), Example 1.

Appellate Case: 26-1330   Page: 15   Date Filed: 05/01/2026 Entry ID: 5635238

R.Doc.168-3, at 8. U.S. Bank permits participants to commence benefits as early as age 55. App.218; R.Doc.168-1, at 15. As explained above, ERISA requires U.S. Bank to pay early retirees a monthly amount that is actuarially equivalent to their accrued benefit. *See supra*, Part II.A (citing 29 U.S.C. §1054(c)(3)). An early retiree's monthly payment is actuarially equivalent to the retiree's accrued benefit (the age-65 SLA) when the two income streams have equal present values. *Reichert v. Kellogg Co.*, 170 F.4th 473, 481 (6th Cir. 2026); *see also* Add.88-89; App.606-607; R.Doc.168-3, at 8-9; App.465; R.Doc.168-2, at 17.

The present value of an income stream is the sum of all expected payments discounted to today's dollars. Two assumptions are critical to this calculation: (1) a mortality assumption, to predict how long the participant will live and, thus, how long payments will be made; and (2) an interest (or discount) rate, to determine the present value of those future payments. *See Reichert*, 170 F.4th at 481; Add.88-89; App.606-607; R.Doc.168-3, at 8-9; App.485; R.Doc.168-2, at 37.

Plan sponsors must state how pension benefits will be calculated. 29 U.S.C. §1102(b)(4). U.S. Bank's Plan neither specifies its mortality or interest-rate assumptions nor refers to an external index or methodology that adjusts to market conditions. App.308; R.Doc.168-1, at 105; App.611; R.Doc.168-3, at 13. Instead, U.S. Bank chose to list fixed multipliers—the early commencement factors ("ECFs"):

Appellate Case: 26-1330    Page: 16    Date Filed: 05/01/2026 Entry ID: 5635238

| Attained age | Reduction factor |
|---|---|
| 55 | 0.38 |
| 56 | 0.42 |
| 57 | 0.46 |
| 58 | 0.50 |
| 59 | 0.55 |
| 60 | 0.60 |
| 61 | 0.66 |
| 62 | 0.73 |
| 63 | 0.81 |
| 64 | 0.90 |
| 65 | 1.00 |

App.113; R.Doc.87-4, at 13; App.308; R.Doc.168-1, at 105. To illustrate, under these ECFs, a participant whose normal-retirement benefit is $1,000/month (i.e., an SLA at age-65) who retires at age 55 will receive 38% of that benefit (an SLA that pays $380/month). A 60-year-old will receive 60% of her normal-retirement benefit ($600/month).

The Plan has used the same ECFs since 2002, but U.S. Bank does not know whether or how particular mortality and interest-rate assumptions were used to generate them. *See* Add.59; App.1368; R.Doc.221, at 4; App.487; R.Doc.168-2, at 39. Regardless, the Plan's ECFs must produce early retirement benefits that are actuarially equivalent to annual benefits commencing at normal retirement age. Thus, the ECFs must find support in reasonable actuarial assumptions. *See infra*, Arg. Parts I & III.A.

7

### C. Plaintiffs' actuary opined that the Plan's ECFs are not consistent with reasonable actuarial assumptions.

Actuarial assumptions change over time. For example, a recent retiree is expected to live (and thus receive benefits) for more than two years longer than when U.S. Bank started using the ECFs in 2002. App.608-11; R.Doc.168-3, at 10-13. This change increases the present value of a participant's accrued normal-retirement benefit, resulting in a smaller reduction (i.e., a higher ECF) to generate an actuarially equivalent early retirement benefit. In contrast, a mortality assumption that predicts participants will die earlier shortens the projected payment period, resulting in a larger reduction (i.e., a lower ECF). App.613-14; R.Doc.168-3, at 15-16; *see, e.g.*, *McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1110 (9th Cir. 2000) ("Changing the life expectancy of a plan participant, of course, can increase or decrease the amount of actuarially equivalent benefits to which he or she is entitled.").

Likewise, a lower discount rate means future payments retain more of their value, narrowing the gap between the present values of standard and early pension benefits. App.614; R.Doc.168-3, at 16. The narrower the gap, the smaller the ECF reduction. Conversely, a higher interest rate widens the gap (reducing the early retirement benefit). *See* App.614; R.Doc.168-3, at 16; *see also Berger v. Xerox Corp. Ret. Income Guar. Plan*, 338 F.3d 755, 759 (7th Cir. 2003) ("Discounting produces dramatic differences between present and future values.").

8

As a result, ECFs that render a benefit actuarially equivalent when adopted may not hold over time. Thus, ECFs set at the *exact* multiplier to achieve minimum actuarial equivalence when calculated are unlikely to accommodate expected changes in mortality and interest rates. To avoid frequent amendments, employers may set ECFs above the minimum necessary in the year of adoption. *See supra* note 1; *see, e.g.*, App.787; R.Doc.168-4, at 152 (recommending slightly elevated ECFs to avoid "get[ting] caught up in short-term fluctuations"). Even still, market shifts and the passage of time warrant reevaluation of early retirement benefit calculations to ensure actuarial equivalence. *See* App.793-94; R.Doc.168-4, at 158-59.

Plaintiffs engaged an actuary, Ian H. Altman, to determine whether the Plan's ECFs generate actuarially equivalent benefits. Altman is a fellow of the Society of Actuaries (SOA)—the actuarial field's highest credential—with forty years' experience advising plan sponsors on pension plan design and operation. App.603; R.Doc.168-3, at 5; App.698-702; R.Doc.168-4, at 63-67. Courts have recognized his "impressive credentials." *E.g.*, *McGuire v. Metro. Life Ins. Co.*, No. 12-cv-10797, 2014 WL 3894363, *9 (E.D. Mich. Aug. 8, 2014).

Altman compared the Plan's ECFs to the conversion factors generated by reasonable actuarial assumptions when participants' benefits were calculated. Add.87-89; App.605-07; R.Doc.168-3, at 7-9. He concluded that the Plan's ECFs generate early retirement benefits that "are significantly less than the actuarial

9

equivalent of participants' SLAs at normal retirement date." Add.87; App.605; R.Doc.168-3, at 7; *see also* Add.96; App.624; R.Doc.168-3, at 26 (explaining that Plan has "excessively reduced early retirement benefits for participants with Part B benefits since 2016"). In rendering his opinions, Altman followed the Actuarial Standards of Practice ("ASOPs") published by the American Academy of Actuaries (the "Academy"). Add.90-94; App.618-22; R.Doc.168-3, at 20-24.

ASOP 35 governs the selection of a mortality assumption; it instructs actuaries to select "reasonable demographic assumptions" that reflect the plan's participant population. Add.85; App.1283; R.Doc.189-6, at 13; *see also* Add.90; App.618; R.Doc.168-3, at 20; App.873-74; R.Doc.168-4, at 238-39. The SOA regularly publishes mortality tables based on the mortality experience of participants in private-sector retirement plans, annually adjusting those tables through "mortality improvement scales." App.609; R.Doc.168-3, at 11. The IRS has incorporated the SOA's mortality tables and improvement scales for the applicable mortality table ("AMT") that it publishes annually, under Internal Revenue Code ("IRC") §417(e), which mandates assumptions for calculating lump sums and certain other calculations. 26 U.S.C. §§417(e)(2)-(3). To calculate the present value of its own pension liabilities, U.S. Bank's actuaries selected a mortality assumption that was consistent with the AMT each year as their "best estimate" of participants' mortality.

10

Add.92; App.620; R.Doc.168-3, at 22. Applying these standards and Plan-specific information, Altman selected the AMT.

ASOP 27 governs the selection of discount rates and requires actuaries to "take into account the purpose of the measurement as a primary factor in selecting a discount rate." Add.84; App.1256; R.Doc. 189-5, at 18. One such purpose is a "market-consistent measurement," which Altman determined best describes the function of measuring actuarially equivalent pension benefits. Add.93; App.621; R.Doc.168-3, at 23; App.883; R.Doc.168-4, at 248. This method uses "current market returns" and often "a hypothetical bond portfolio whose cash flows reasonably match the pattern of expected future payments." Add.93; App.621; R.Doc.168-3, at 23. Altman selected the "applicable interest rate" (the IRS Segment Rates) published monthly under 26 U.S.C. §417(e)(3)(C) and 26 C.F.R. §1.417(e)-1(d)(2) and (d)(3). Add.95-96; App.623-24; R.Doc.168-3, at 25-26. They track the yields of high-quality corporate bonds, using "segments" to align the bond yields with each expected payment.[2] App.621-22; R.Doc.168-3, at 23-24.

---

[2] The IRS publishes the applicable interest rates monthly. Altman used the rates from October of the year preceding each participant's benefit commencement date. Add.96; App.624; R.Doc.168-3, at 26. Thus, for Plaintiff Adams, who started receiving benefits in 2021, Altman used the rates from October 2020 (.54%, 2.38% and 3.28%). For Plaintiff Pettenger, who started receiving benefits in 2020, Altman used the rates from October 2019 (2.01%, 3.06% and 3.65%). For Plaintiff Snead, who started benefits in 2019, Altman used the rates from October 2018 (3.33%, 4.39% and 4.72%). *See* Internal Revenue Serv., *Minimum Present Value Segment*

Appellate Case: 26-1330    Page: 21    Date Filed: 05/01/2026 Entry ID: 5635238

Altman's analysis yielded a stark disparity. For a 60-year-old participant retiring in 2022, the Treasury assumptions generate an early commencement factor of .73—meaning she should receive 73% of her age-65 benefit. Add.97; App.625; R.Doc.168-3, at 27. Yet, the Plan's ECF for a 60-year-old is .60. App.308; R.Doc.168-1, at 105. The gap is not trivial in dollar terms: using the class's median monthly benefit amount, the Plan underpays retiring 60-year-olds by $108 per month and retiring 55-year-olds by $224 per month—every month, for the remainder of their lives. Add.97; App.625; R.Doc.168-3, at 27.

### D. Defendants' actuary opined that the Plan's ECFs fall within a reasonable range.

To rebut Altman's report, Defendants retained Thomas Terry. Although Terry professed to be "unaware" of any "requirement" to use reasonable assumptions "in calculating early retirement benefits," App.460; R.Doc.168-2, at 12, he agreed that reasonable assumptions are inherent in actuarial practice and that the ASOPs inform what is reasonable, *see* App.468-69; R.Doc.168-2, at 20-21. Terry did not challenge Altman's selected assumptions—the §417(e) segment rates and applicable mortality table—as unreasonable; he simply did not consider them. App.1158; R.Doc.189-3, at 210. Rather, opining that "ECFs will be considered reasonable if they fall within a range" as large as plus or minus 5%, App.481; R.Doc.168-2, at 33, Terry conducted

---

*Rates*, https://www.irs.gov/retirement-plans/minimum-present-value-segment-rates (last visited Apr. 28, 2026).

Appellate Case: 26-1330     Page: 22     Date Filed: 05/01/2026 Entry ID: 5635238

a "benchmarking" exercise to evaluate whether the Plan's ECFs fell within a range he constructed using "contemporary demographic and economic assumptions." App.1000; R.Doc.189-3, at 52.

For mortality, Terry used the "headcount-weighted" version of the Pri-2012 table,[3] which reflects private-sector pensioner experience from 2010-2014, and tables published by the Center for Disease Control ("CDC") for the general population. App.487-88; R.Doc.168-2, at 38-40. Terry did not evaluate or consider U.S. Bank's mortality experience or compare that experience to either the Pri-2012 or CDC tables that he used. App.1073-74, 1184; R.Doc.189-3, at 125-26, 236. Moreover, Terry was unaware of any plan that uses a "headcount-weighted" mortality table to calculate benefits. App.1086, 1088-89, R.Doc. 189-3 at 138, 140-41. Likewise, Terry had never seen a plan use a CDC table to calculate benefits nor recommended that a plan sponsor use a CDC table.[4] App.1073-74, 1088-89; R.Doc.189-3, at 125-26. For his interest-rate assumption, Terry selected a range of 7.3% to 8.1%, which he derived from the expected return on the Plan's own

---

[3] Although the Treasury Department began using a version of the Pri-2012 table as the AMT in 2024, App.619; R.Doc.168-3, at 21, the AMT is a "benefits-weighted" (i.e., "amounts-weighted") table. App.1090; R.Doc.189-3, at 142; *see generally* 88 Fed. Reg. 72,357, 72,359 (Oct. 20, 2023). The "benefits-weighted" and "headcount-weighted" versions are different. App.1088-89; R.Doc.189-3, at 140-41.

[4] The CDC tables reflect the mortality experience of the entire U.S. population, App.488; R.Doc.168-2, at 40, including individuals who were too sick or disabled to work (or earn a pension).

13

investment portfolio, not bond yields or current market rates. *See* App.488-89, 553-60; R.Doc.168-2, at 40-41, 105-112.

Applying these assumptions, Terry produced a range of ECFs and determined that the Plan's Part B ECFs fall within that range at every commencement age from 55 to 64. App.489; R.Doc.168-2, at 41.

### III.   Procedural History

Plaintiffs filed this putative class action on February 28, 2022, asserting that Defendants violated ERISA by using unreasonable actuarial assumptions to reduce Plaintiffs' early retirement benefits below what ERISA's actuarial-equivalence mandate requires. *See* App.30-33; R.Doc.1, at 1-4.

***Motion to Dismiss.*** On May 23, 2022, Defendants moved to dismiss the complaint and to strike Plaintiffs' class allegations. *See* R.Doc.21, at 1-2. The district court denied both motions. *Adams v. U.S. Bancorp*, 635 F.Supp.3d 742, 746 (D. Minn. 2022). The court concluded that Plaintiffs had plausibly stated a claim that ERISA's actuarial-equivalence provision requires the use of reasonable underlying assumptions, while observing that "discovery may reveal that the actuarial industry does not interpret 'actuarial equivalen[ce]' to require calculating benefits with reasonable rates and mortality figures." *Id*. at 754. Defendants answered on November 7, 2022. App.63; R.Doc.42, at 1.

Appellate Case: 26-1330     Page: 24     Date Filed: 05/01/2026 Entry ID: 5635238

***Motion for Class Certification.*** After the completion of discovery, Plaintiffs moved to certify a class of Plan participants and beneficiaries who started receiving Part B benefits reduced by Part B's ECFs on or after March 1, 2016, and whose monthly pension benefit would have been greater under the §417(e) actuarial assumptions. *See* App.93-94; R.Doc.84, at 1-2.

But Plaintiffs were aware that including certain Part A participants—those who had accrued benefits in the form of a ten-year certain and life annuity ("10CLA") rather than an SLA—might complicate certification. Accordingly, Plaintiffs alternatively requested that, should the court disagree with their position, the court could exclude those Part A beneficiaries from the class. *See* Add.26; App.167; R.Doc.199, at 7. The district court denied class certification on April 4, 2025. *See* Add.1; App.140; R.Doc.173, at 1. The court did not address Plaintiffs' alternative request to certify a narrower class.

***Motion for Leave to File Renewed Class Certification Motion.*** Thereafter, Plaintiffs moved for leave to file a renewed motion for class certification as to the narrowed class. App.159-60; R.Doc.178, at 1-2. Magistrate Judge Brisbois granted Plaintiffs' motion for leave and issued a report and recommendation urging the district court to certify that class. Add.20; App.161; R.Doc.199, at 1. Defendants filed an objection to the Report and Recommendation. R.Doc.206, at 1-23. The district court never ruled on the objection. Instead, the court granted summary

Appellate Case: 26-1330    Page: 25    Date Filed: 05/01/2026 Entry ID: 5635238

judgment against Plaintiffs and simultaneously denied their renewed motion for class certification as moot. Add.82; App.1391; R.Doc.221, at 27.

***Daubert and Summary Judgment Motions.*** On April 1, 2025, Defendants moved to exclude the expert testimony of Ian Altman and for summary judgment. App.197-98; R.Doc.164, at 1-2. On January 16, 2026, the district court granted both the *Daubert*[5] motion and the motion for summary judgment. *See* Add.56; App.1365; R.Doc.221, at 1. Judgment entered on January 17, 2026. App.1393; R.Doc.223, at 1. Plaintiffs timely filed their notice of appeal on February 13, 2026. *See* App.1395; R.Doc.225, at 1.

## IV. Rulings Presented for Review

### A. *Daubert* and Summary Judgment Motions

***Daubert.*** The court concluded that Altman's methodology was unreliable under Federal Rule of Evidence 702(c).[6] Add.64; App.1373; R.Doc.221, at 9. The court's reliability decision rested on two grounds. First, the district court concluded that Altman's selection of interest-rate assumptions promulgated under 26 U.S.C. §417(e) was inapposite because those assumptions are required for lump-sum conversions, not modifications to an ongoing annuity payment stream. Add.65-67;

---

[5] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

[6] The court did not question Altman's qualifications, the relevance of his opinions, the sufficiency of his data, or the technical accuracy of his calculations, finding that Plaintiffs had "generally met the requirements of Rule 702(a), (b), and (d)." Add.64; App.1373; R.Doc.221, at 9.

App.1374-76; R.Doc.221, at 10-12. Second, it faulted Altman for assessing the Plan's ECFs against a single set of ECFs rather than a range of factors, which the court viewed to be nonstandard actuarial practice. Add.68-72; App.1377-81; R.Doc.221, at 13-16.

*Summary judgment.* The district court granted summary judgment on two grounds. First, the court held, contrary to the thrust of its motion-to-dismiss ruling, that actuarial equivalence does not require the use of reasonable underlying assumptions. Add.72-76; App.1381-85; R.Doc.221, at 17-21. Relying on Terry's expert testimony and the definition of "actuarial equivalent" in 26 C.F.R. §1.401(a)(4)-12, the court held that the term imposes no constraint on the reasonableness of the underlying assumptions—only that both payment streams be measured against the same yardstick. Add.74-75; App.1383-84; R.Doc.221, at 19-20. Second, the court held that, even assuming a reasonableness requirement applied, Plaintiffs lacked sufficient evidence to proceed to trial, because with Altman's testimony excluded, Plaintiffs were left with no expert to contest Defendants' showing. Add.77-81; App.1386-90; R.Doc.221, at 22-26.

The court accordingly granted summary judgment on Plaintiffs' breach of fiduciary duty claim as well, treating it as derivative of the §1054(c)(3) claim. Add.82; App.1391; R.Doc.221, at 27.

## B.     Denial of Class Certification

The district court denied Plaintiffs' motion for class certification on two grounds. First, in contrast to Part B ECFs, the district court concluded that "Part A Firstar's optional form conversion factors are generally more generous than the 417(e) Factors" adopted by Altman. Add.15; App.154; R.Doc.173, at 15. On that basis, the court found a lack of commonality because some Part A participants might be better off under the Plan's existing ECFs. Add.15-16; App.154-55; R.Doc.173, at 15-16. Second, the court found a lack of typicality because the methodology needed to evaluate accrued Part A Firstar benefits differed from the methodology used to evaluate accrued Part B benefits in a way that presented a legal issue unique to certain class members. Add.18-19; App.157-58; R.Doc.173, at 18-19. The court did not address whether a narrower class excluding Part A Firstar participants could be certified.

## SUMMARY OF ARGUMENT

**I.** ERISA requires that early retirement benefits "shall be the actuarial equivalent" of a participant's "annual benefit commencing at normal retirement age." 29 U.S.C. §1054(c)(3). "Actuarial equivalent" is a term of art with an established meaning in the actuarial profession: two benefit streams are equivalent when their present values are equal under the same set of assumptions. *Stephens*, 644 F.3d at 440. The actuarial profession's own governing standards—ASOPs 1, 27,

18

and 35—confirm that those assumptions must reasonably reflect current demographic and economic conditions. Legislative history, administrative decisions, and caselaw support the same conclusion. The district court's contrary holding was legal error.

**II.** The district court abused its discretion by excluding the testimony of Plaintiffs' expert, Ian Altman. First, the district court erroneously read §417(e)'s mandatory use in lump-sum conversions to foreclose its permissive application to early retirement benefits.

For his mortality and discount-rate assumptions, Altman applied the governing actuarial standards—ASOPs 35 and 27, respectively—both of which support using §417(e) assumptions as the appropriate benchmark. For mortality, ASOP 35 directs actuaries to select a table that best represents expected future experience for the plan's participant population, drawn from the actual experience of pensioners rather than the general public. The AMT published annually under 26 U.S.C. §417(e)(3)(B) does precisely that: it incorporates the SOAs' mortality tables based on private-sector pensioner experience. For the discount rate, ASOP 27 directs actuaries performing "market-consistent measurements" of pension benefit streams to select rates derived from high-quality bond yields matched to expected payment durations. The §417(e) segment rates—derived from AA-rated corporate bond yields—satisfy that standard. The district court's concern that Altman never

19

advised a client to adopt §417(e) factors for ECF purposes misunderstood his task here: Altman was not designing a plan; he was setting a baseline to test whether the Plan's ECFs were consistent with reasonable assumptions.

Second, the district court identified no actuarial authority—from the ASOPs or otherwise—requiring that an actuarial-equivalence assessment compare plan ECFs to a range of ECFs, rather than a single set derived from well-supported assumptions. Apart from crediting Defendants' expert, the district court's sole authority was ASOP 1 §2.10's general observation that "there will often be a range of reasonable methods and assumptions." But that does not mean the only actuarially sound way to assess the actuarial equivalence of ECFs is to compare them to the ECFs generated from multiple combinations of reasonable assumptions. Altman's methodology—applying ASOPs 27 and 35 to identify baseline assumptions for a market-consistent present-value calculation—rests on good grounds and should not have been excluded.

**III.** The district court's summary judgment decision rested on the foregoing errors. Having incorrectly held that actuarial equivalence imposes no reasonableness constraint, and having incorrectly excluded Altman's testimony, the court faced no genuine dispute of material fact. Once those errors are corrected, the genuine dispute is undeniable: Plaintiffs' expert applied governing actuarial standards to calculate baseline ECFs for each year at issue and found that the Plan's ECFs fell materially

20

short. A reasonable factfinder crediting that testimony could find for Plaintiffs. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The district court's contrary conclusion—which resolved the competing expert dispute by crediting Defendants' expert—is precisely the weighing of evidence that Rule 56 forbids.

**IV.** The district court denied class certification solely on grounds relating to Plan participants who had accrued Part A Firstar benefits—a distinct subset that Plaintiffs proposed to exclude from an alternative, narrower class. The district court denied class certification without addressing this alternative request. On remand, the district court should be directed to consider the merits of certifying the narrowed class.

## ARGUMENT

### Standards of Review

This court reviews questions of law *de novo*, *Harrod v. Farmland Mut. Ins. Co.*, 346 F.3d 1184, 1186 (8th Cir. 2003), including the trial court's grant of summary judgment, *Kiemele v. Soo Line R.R.*, 93 F.3d 472, 474 (8th Cir. 1996). The court views the evidence in the light most favorable to Plaintiffs, deciding whether there are no issues of material fact and whether Defendants were entitled to judgment as a matter of law. *Id.* The standard of review for excluding expert testimony is abuse of discretion. *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of

21

admissibility. *In re Wholesale Grocery Prods. Antitrust Litig.*, 946 F.3d 995, 1001 (8th Cir. 2019).

## I. An ECF must be consistent with reasonable actuarial assumptions.

The district court concluded that "actuarial equivalence does not require reasonable underlying assumptions." Add.74; App.1383; R.Doc.221, at 19. That is not correct.

In relevant part, ERISA provides that:

> in the case of any defined benefit plan, if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age, ... the employee's accrued benefit ... shall be *the actuarial equivalent* of [an annual benefit commencing at normal retirement age].

29 U.S.C. §1054(c)(3) (emphasis added). "ERISA's actuarial equivalence requirement serves to protect actual retirees, not merely ensure that pension plans correctly perform abstract calculations." *Stephens*, 644 F.3d at 443 (Kavanaugh, J., concurring). The statutory language, legislative history, administrative constructions, and caselaw all support the conclusion that in order to be *actuarially equivalent* the conversion of one form of retirement benefit to another must be determined using reasonable actuarial assumptions.[7]

---

[7] Although he denied that actuarial assumptions need be reasonable, U.S. Bank's expert, Thomas Terry, himself inserted the qualifying adjective "appropriate" (a synonym for reasonable), in explaining how two actuarial

Appellate Case: 26-1330    Page: 32    Date Filed: 05/01/2026 Entry ID: 5635238

### A. Statutory Language

Because Congress did not define "actuarial equivalent," the district court correctly accepted that the meaning of this "term of art" comes from actuarial science. *Adams*, 635 F.Supp.3d. at 750-51. But the district court severed the term from the professional framework that gives it content. Although actuarial equivalence is achieved when two forms of benefits have an equal present value,[8] it is not a static formula. The meaning of the term is inseparable from the judgment, methodology, and professional standards that actuaries use when selecting the assumptions needed to calculate present values. *See Reichert*, 170 F.4th at 480-82; *see also Pizza Pro Equip. Leasing, Inc. v. Comm'r of Internal Revenue*, 147 T.C. 394, 412 (T.C. 2016) (interpreting "actuarial equivalence" to require "reference to practice within the field of actuarial science").

As explained above, the present value of an annuity is the sum of all future expected payments discounted to today's dollars. *See supra*, Stmt. of Case Part II.B.

---

equivalent calculations might differ. Add.80; App.1389; R.Doc.221, at 25 (quoting Terry's report at ¶67) ("[I]f Actuary #1 selects one set of *appropriate* actuarial assumptions to perform an actuarial equivalence calculation, and Actuary #2 selects a different set of *appropriate* actuarial assumptions, the actuaries will have used the same mathematical process, but will not necessarily compute the exact same actuarially equivalent benefit.") (emphasis added).

[8] *Adams*, 635 F.Supp.3d at 751; *see also Stephens*, 644 F.3d at 440 (citing Jeff L. Schwartzmann & Ralph Garfield, Educ. & Exam. Comm. of the Soc'y of Actuaries, *Actuarially Equivalent Benefits*, https://perma.cc/XKD8-FDLW).

Appellate Case: 26-1330     Page: 33     Date Filed: 05/01/2026 Entry ID: 5635238

Actuaries calculating the present value of annuities therefore focus their efforts on predicting how long plan beneficiaries will live (mortality) and assessing the present-day value of future income (discount rate). *Id.* These assumptions directly inform the appropriate early retirement benefit reduction to achieve equal present value. *See supra*, Stmt. of Case Part II.C. For example, shorter life expectancy and high discount rates reduce the present value of an early retirement benefit relative to the normal retirement benefit. *See id.* Accordingly, actuaries follow professional standards when selecting these key assumptions.

The Actuarial Standards of Practice instruct actuaries to use reasonable assumptions to determine actuarial equivalence. ASOP 35 §3.2.5 requires actuaries conducting present-value calculations to select "reasonable" mortality assumptions that reflect "current and historical data that is relevant to selecting the assumption for the measurement date, to the extent such relevant data is reasonably available" and "the actuary's estimate of future experience." Add.86; App.1286; R.Doc.189-6, at 16. Likewise, ASOP 27 §3.6 instructs actuaries to select a "reasonable" discount rate that "takes into account current and historical economic data that is relevant to selecting the assumption for the measurement date." App.1251; R.Doc.189-5, at 13. For over thirty years, the SOA has instructed students that "assumptions used [for actuarial equivalence] must be reviewed and modified so as to insure that they

24

continue to fairly assess the cost of the optional basis of payment." Schwartzmann & Garfield, *supra* note 8, at 11.[9]

The actuarial literature thus counsels that actuarial-equivalence calculations must employ reasonable assumptions. As the *Reichert* court explained:

> Actuaries are professionals, and a core part of their job is to perform calculations and make predictions based on real-world conditions. Competent performance of this professional obligation demands that actuaries base their forecasts on assumptions which at the time of the valuation seem to be the most appropriate for the case at hand. Recognition of these basic concepts is part of our duty to evaluate the term "actuarial equivalent" by reference to the art or science to which it is appropriate.

*Reichert*, 170 F.4th at 482 (cleaned up).

The district court's holding conflicts with these professional standards and produces an impermissible statutory interpretation. Allowing any assumptions to be employed to calculate early retirement benefits, *see* Add.75-76; App.1384-85; R.Doc.221, at 20-21, would render the phrase "actuarial equivalent" superfluous. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) (Courts should reject interpretations that make statutory terms "insignificant, if not wholly superfluous."); *Miller v. Xerox Corp. Ret. Income Guar. Plan*, 464 F.3d 871, 876 n.5 (9th Cir. 2006)

---

[9] Although the foregoing are relatively contemporary sources, the term "actuarial equivalent" had the same meaning before and at the time of ERISA's enactment in 1974. *Reichert*, 170 F.4th at 480-82 (discussing technical meaning of the term at that time).

25

(observing that "ERISA's actuarial equivalence requirement" cannot be meaningless). If an employer is free to use unreasonable assumptions and define an actuarially equivalent benefit circularly—i.e., as "a benefit of equal value computed on the basis of the tables, factors and assumptions set forth in the Plan Statement," Add.76; App.1385; R.Doc.221, at 21 (citing Plan Document §2.1.2)—then the statutory phrase "actuarial equivalent" imposes no constraint.[10] Any early retirement benefit a plan chooses to pay would, by definition, be "actuarially equivalent" to the normal retirement benefit because the plan's own ECFs would always validate that conclusion. *See, e.g.*, *Esden*, 229 F.3d at 164 ("If plans were free to determine their own assumptions and methodology, they could effectively eviscerate the protections provided by ERISA's requirement of 'actuarial equivalence.'").[11] Uprooting the definition of actuarial equivalence from actuarial-practice standards leaves behind a vacuum rather than the term Congress selected.

---

[10] To illustrate, if the company's actuary were to assume that all employees will die immediately after normal retirement age, before their single life annuity started to pay out, then the present value of their SLA would be $0, so that an employee retiring early would not be entitled to any early retirement benefit. Yet, the district court's reading of the statute would appear to permit such a result.

[11] The district court agreed when denying Defendants' motion to dismiss, concluding that ERISA should be interpreted to provide a "legal mechanism to police unreasonable rate selection." *Adams*, 635 F.Supp.3d at 754.

Appellate Case: 26-1330     Page: 36     Date Filed: 05/01/2026 Entry ID: 5635238

## B. Legislative History

Interpreting "actuarial equivalent" in §1054 to require the use of reasonable assumptions is also consistent with ERISA's legislative history and purpose.

Congress embraced actuarial science when enacting ERISA. In Senate Report No. 93-127, the Committee on Labor and Public Welfare explained that ERISA authorized the Treasury Department, "not to prescribe what actuarial assumptions must be used, but rather to assure that those which are used are reasonable and reflect relevant experience." S. Rep. No. 93-127, at 4853 (1973). The committee also recognized that the Academy had the "most rigorous standards for admission to membership." *Id*. Testimony from its president-elect, included the Academy's 1969 "Guides to Professional Conduct," which emphasized the need for an actuary to "exercise his best judgment to ensure that any calculations or recommendations … are based on sufficient and reliable data, that any assumptions made are adequate and appropriate, and that the methods employed are consistent with the sound principles established by precedents or common usage within the profession." Ret. Income Sec. for Emps. Act, 1972: Hearings Before the Subcomm. on Labor of the S. Comm. on Labor & Pub. Welfare, 92d Cong., 2d Sess. pt. 3, at 1241, 1248 (1972).

## C. Administrative Interpretations

Further support for Plaintiffs' argument concerning the meaning of "actuarial equivalent" comes from the agencies charged with responsibility for implementing

27

and enforcing ERISA: the Departments of Treasury and Labor. The Treasury Department has interpretive authority over 29 U.S.C. §§1053, 1054 and 1056, and their parallel provisions in the Internal Revenue Code. [12] 29 U.S.C. §1202(c); *Central Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 746-47 (2004); *see also* 29 U.S.C. §1056(a) (delegating authority to Secretary of Treasury to issue regulations concerning the term "actuarially reduced").

The Treasury regulation that directly applies to 29 U.S.C. §1054(c)(3) provides that, "if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age" (such as an early retirement benefit), then that benefit "shall be the actuarial equivalent" of the normal-retirement benefit, "as determined by the Commissioner [of Internal Revenue]." 26 C.F.R. §1.411(c)-1(e). In earlier regulations, the IRS prescribed the allowable actuarial reductions to the accrued benefit for participants that terminate service before retirement.[13] Such reductions must be "in accordance with *reasonable*

---

[12] Many of the provisions of ERISA were codified twice, both in Title 29 and also in the Internal Revenue Code, which governs the tax treatment of employee benefit plans.

[13] Like an employee who retires early, a participant who stops working before commencing his benefits must receive "not less" than an "actuarially reduced" benefit amount "to which he would be entitled at [age 65]." 29 U.S.C. §1056(a)(3).

Appellate Case: 26-1330     Page: 38     Date Filed: 05/01/2026 Entry ID: 5635238

*actuarial assumptions*."[14] 26 C.F.R. §1.401(a)-14(c)(2) (emphasis added). Section 1.411(a)-4(a), which concerns ERISA's anti-forfeiture rule, in turn provides that "adjustments in excess of reasonable actuarial reductions[] can result in rights being forfeitable." 26 C.F.R. §1.411(a)-4(a).

The Department of Labor agrees. In a case currently pending in the Eleventh Circuit, the Department of Labor submitted an *amicus curiae* brief explaining that the term "actuarial equivalent," as used in 29 U.S.C. §1055(d), "inherently requires the use of reasonable actuarial assumptions." Br. for the Acting U.S. Sec'y of Lab. as Amicus Curiae at 8, *Drummond v. Southern Co. Servs., Inc.*, No. 24-12773 (11th Cir. Dec. 4, 2024). Thus, both Executive Branch departments with administrative authority over ERISA concur that ERISA's "actuarial equivalent" requirement mandates that pension plans use reasonable actuarial assumptions. Those unanimous views are entitled to the judiciary's respect, even if not its automatic deference. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 403 (2024).

### D.    Caselaw

ERISA's actuarial-equivalence requirement—properly understood—ensures that when a participant selects from different retirement benefit options, the

---

[14] The Treasury promulgated 26 C.F.R. §1.401(a)-14 on September 28, 1976, shortly after ERISA's enactment. *See* 41 Fed. Reg. 42,648, 42,651 (Sept. 28, 1976). It adopted 26 C.F.R. § 1.411(c)-1(e) on August 23, 1977. 42 Fed. Reg. 42,318, 42,339 (Aug. 23, 1977).

Appellate Case: 26-1330     Page: 39     Date Filed: 05/01/2026 Entry ID: 5635238

beneficiary will not be shortchanged by selecting one option over another. *See Duffy v. Anheuser-Busch Cos., LLC*, 449 F.Supp.3d 882, 889 (E.D. Mo. 2020) (explaining that ERISA's protections ensure "the participant receives the equivalent amount he or she earned under the plan, no matter the form of annuity under which he or she chooses to receive it"). In this regard, courts analyzing ERISA's actuarial-equivalence requirement have consistently held that reasonable assumptions must be used. "ERISA did not leave plans free to choose their own methodology for determining the actuarial equivalent of the accrued benefit …." *Laurent v. PricewaterhouseCoopers LLP*, 794 F.3d 272, 286 (2d Cir. 2015).

In *McDaniel*, for example, the Ninth Circuit analyzed §1054's actuarial-equivalence requirement. It observed that "[t]he most important consideration in preparing and selecting a mortality table to be used in calculating pension benefits is whether the population from whom the mortality experience is developed is sufficiently broad and has characteristics that are typical of the plan's participants." 203 F.3d at 1110 (citing William W. Fellers & Paul H. Jackson, *Noninsured Pension Mortality: The UP-1984 Mortality Table*, 25 The Proceedings 456, 457 (1975)). *McDaniel* held that the plan complied with §1054(c)(3) when it modified a standard mortality table to reflect the plan's mortality experience. 203 F.3d at 1119-21.

In *Dooley v. American Airlines, Inc.*, 797 F.2d 1447 (7th Cir. 1986), the plaintiffs alleged that they received "benefits which were less than actuarially

30

equivalent to the normal retirement annuity." *Id*. at 1449. The Seventh Circuit reversed the trial court's award of summary judgment to the defendants. *Id*. at 1454. Citing the plaintiffs' expert's testimony—that "actuarial equivalence must be determined on the basis of reasonable actuarial assumptions, consistently applied, including a reasonable interest assumption"—the court found an issue of fact as to whether the interest rate the plan used was reasonable. *Id*. at 1453-54. Following remand, the trial court found that the plaintiffs must receive a benefit calculated with an assumption "relative to the market" on "the date of the [individual's] retirement," and not a rate "which is but a ghost of the past."[15] *Dooley v. American Airlines, Inc.*, No. 81-cv-6770, 1993 WL 460849, at *10-11 (N.D. Ill. Nov. 4, 1993) (internal quotation marks omitted).

The decisions in *Pizza Pro* are also on point. The Tax Court interpreted the meaning of the term "the actuarial equivalent" in a Treasury regulation accompanying another section of ERISA. 147 T.C. at 411. It held that "actuarially equivalent" must be "determined on the basis of actuarial assumptions with respect

---

[15] *Dooley* concerned the calculation of lump-sum benefits, which now must be calculated using prescribed interest-rate and mortality assumptions. But these requirements were not in effect in 1981-82, when the plaintiffs alleged that they did not receive actuarially equivalent benefits. *See Dooley*, 797 F. 2d at 1449; *see also* Tax Reform Act of 1986, Pub. L. 99-514, § 1139(b), 100 Stat. 2085 (1986) (requiring plans to apply specific assumptions when calculating lump sums for the first time). Thus, *Dooley* involved the same basis for determining actuarial equivalence as Plaintiffs assert here.

31

to mortality and interest which are reasonable in the aggregate" and that "special attention must be paid to the actuarial assumptions underlying the computations." *Id.* This Court affirmed, finding the Tax Court's decision to be a "thorough and well-reasoned opinion" about the meaning of the term "actuarial equivalence" within the "general practice ... of actuarial science." *Pizza Pro Equip. Leasing, Inc. v. Comm'r of Internal Revenue*, 719 Fed.App'x 540, 541-42 (8th Cir. 2018).

## II.     The district court wrongly excluded expert testimony that the Plan's ECFs are not consistent with reasonable actuarial assumptions.

The district court abused its discretion by excluding Altman's testimony on the ground that his methodology was unreliable under Rule 702(c). To the contrary, Altman followed the actuarial profession's standards of practice. He carefully selected assumptions widely used in the pension industry to determine whether the Plan provided actuarially equivalent benefits. The relevant question is whether the ECFs that result from Altman's selected assumptions demonstrate that the Plan does not provide actuarially equivalent benefits. But that is not a gatekeeping question under *Daubert*. Even if the district court doubted the usefulness of Altman's testimony, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of addressing shaky but admissible evidence." *In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, 9 F.4th 768, 778 (8th Cir. 2021) (quoting *Daubert*, 509 U.S. at 596).

Appellate Case: 26-1330     Page: 42     Date Filed: 05/01/2026 Entry ID: 5635238

**A.  Altman's methodology reliably assessed whether the Plan provides actuarially equivalent benefits.**

U.S. Bank has used the same ECFs to calculate participants' Part B benefits since 2002 but does not know which, if any, actuarial assumptions were used to generate those factors. *Supra*, Stmt. of Case Part II.B. Plaintiffs' expert did not select assumptions to dictate the precise ECFs that U.S. Bank should have used. Instead, Altman selected assumptions that establish a baseline of reasonableness to test whether the Plan's ECFs fall short of actuarial equivalence. Simply stated, Altman's method answers the question: are the plan's ECFs so low that they fall outside the range that any reasonable actuarial assumption could produce? And because the Plan's ECFs fell far below his baseline ECFs, Altman opined that U.S. Bank's ECFs do not produce actuarially equivalent benefits.

To select assumptions to determine actuarial equivalence, Altman started with the Academy's "Applicability Guidelines," which instruct actuaries on which ASOPs apply when performing various calculations. The Applicability Guidelines provide that ASOPs 27 and 35 apply when actuaries give "advice to plan sponsors on selection of assumptions for plan's actuarial equivalence...." App.617; R.Doc.168-3, at 19.

For mortality, ASOP 35 directs actuaries to select a table that is "reasonable." Add.90; App.618; R.Doc.168-3, at 20. An assumption is "reasonable" if is "reflects the actuary's professional judgment" and "takes into account current and historical

33

data ...." Add.90; App.618; R.Doc.168-3, at 20 (citing ASOPs 35 at § 3.2.5(c)). As Altman explained, "there are a finite number of baseline mortality tables that pension actuaries have commonly used" after 2012, namely, the "retirement-plan specific tables published by the Society of Actuaries ...." Add.90-92; App.618-20; R.Doc.168-3, at 20-22. The Treasury Department uses the SOA's retirement-plan specific mortality tables as the basis for the AMT, which it publishes annually under 26 U.S.C. §417(e)(3)(B); *see supra* note 3.

For the discount rate, ASOP 27 directs actuaries to select a rate appropriate to the purpose of the calculation, such as "market-consistent measurements." ASOP 27 further instructs that rates derived from bond yields that match to the duration of expected payments are the appropriate methodology for such a purpose. Add.84; App.1256; R.Doc.189-5, at 18; App.621-22; R.Doc.168-3, at 23-24. Applying that standard, Altman selected the IRS segment rates published under §417(e)(3)(C), which are derived from the yields of high-quality AA-rated corporate bonds. The §417(e) discount rates are divided into three segments to align with the duration of the pension benefit's expected payments. App.621-22; R.Doc.168-3, at 23-24; 89 Fed. Reg. 2127 (Jan. 12, 2024).

The district court excluded Altman's testimony on the grounds that (1) Altman's discount-rate assumptions were "not in line with actuarial science or the practices of other actuaries." Add.65; App.1374; R.Doc.221, at 10, and

34

Appellate Case: 26-1330    Page: 44    Date Filed: 05/01/2026 Entry ID: 5635238

(2) standard actuarial practice required Altman to provide a "range of values that could be actuarially equivalent" to compare against U.S. Bank's ECFs, rather than baseline ECFs for each relevant year. Add.69; App.1378; R.Doc.221, at 14. The court was wrong on both counts.

### B. The district court erred in faulting Altman's selection of §417(e) segment rates.

The district court abused its discretion by finding that Altman's discount rate assumption did not comply with actuarial practice. *See* Add.65; App.1374; R.Doc.221, at 10. The court did not assess actuarial methods. Instead, its conclusion largely rested on the legal premise that the §417(e) assumptions are "for the limited purpose of converting a participant's normal benefit to a one-time lump-sum distribution, not modifying a regular payment stream." Add.66; App.1375; R.Doc.221, at 11. That premise was wrong. Although the court cited ¶37 of Terry's report, Add.66; App.1375; R.Doc.221, at 11, Terry acknowledged that §417(e) assumptions apply to all "accelerated forms of payment" and provided examples of forms other than lump sums. App.461; R.Doc.168-2, at 13; *see also* Add.75; App.1384; R.Doc.221, at 20.

Although plans are not required to use the Treasury assumptions for most annuity forms that do not "decrease during the life of the participant," 26 C.F.R. §1.417(e)-1(d)(6), they are permitted to do so. Plans may use §417(e)(3) assumptions to calculate benefits beyond the regulation's mandate—including early

35

retirement benefits. *See, e.g.*, *Urlaub v. CITGO Petroleum Corp.*, 750 F.Supp.3d 863, 868 (N.D. Ill. 2024) (describing how CITGO's actuaries "recommended that CITGO update its plans' actuarial assumptions" to the 417(e) assumptions); *see also* App.1199; R.Doc.189-3, at 252 (Terry testifying "there is a whole array of other possibilities for my non-mandated 417(e)-type calculations that I might choose to implement for some other plan provision.").

U.S. Bank itself has used the §417(e)(3) assumptions to calculate several "non-mandated" forms. It used them to calculate Plaintiffs Pettenger's and Snead's early retirement annuities under Part A of the Plan. App.628; R.Doc.168-3, at 30; *see also* App.494; R.Doc.168-2, at 46 (Terry explaining that, to calculate Pettenger's "SLA reduced for early retirement, the Mercantile Plan provisions apply the IRC 417(e) applicable mortality and applicable interest rates."). By law, these Part A annuities (like the Part B annuities at issue here) must be "the actuarial equivalent, using reasonable assumptions, of the then-current balance of [the participant's] hypothetical account ...." 26 C.F.R. §1.411(a)(13)-1(b)(3). U.S. Bank also used the Treasury assumptions to calculate the amount of a participant's SLA when the participant rolls over 401(k) assets through the Plan's "Annuity Purchase Option." Add.95; App.623; R.Doc.168-3, at 25; App.307; R.Doc.168-1, at 104 (Treasury assumptions used to "convert a rollover amount to a Single Life Benefit form").

36

Appellate Case: 26-1330     Page: 46     Date Filed: 05/01/2026 Entry ID: 5635238

Again, there is no rule that plans *must* use §417(e) assumptions to calculate early retirement benefits. But Altman did not contend that §417(e) dictates the assumptions for ECF calculations. Rather, he opined that §417(e) assumptions reflect the floor of actuarial reasonableness for any present-value calculation that determines a participant's minimum guaranteed benefit. *See, e.g.*, App.786; R.Doc.168-4, at 151 (expressing opinion that "the plan needs to provide benefits that are at least as generous as the benefits provided by 417(e)"); App.814; R.Doc.168-4, at 179 ("417(e) would be the floor").

Altman's use of Treasury assumptions is supported by actuarial methodology and practice. Far from giving "the Court no reason to believe that his methods are generally accepted in the field," Add.70; App.1379; R.Doc.221, at 15, Altman rooted his analysis in the ASOPs, which the district court acknowledged as the authority guiding "appropriate actuarial practice in the United States." Add.70; App.1379; R.Doc.221, at 15; *see also* App.468; R.Doc.168-2, at 20; App.617; R.Doc.168-3, at 19. The ASOPs are precisely "the kind of objective source referenced in *Daubert*" that allows the Court "to evaluate [an expert's] analyses against a benchmark of an objective body's guidelines." *Sec. & Exch. Comm'n v. Life Partners Holdings, Inc.*, 854 F.3d 765, 777 (5th Cir. 2017). Here, Altman selected ASOPs that apply to selecting assumptions for actuarial-equivalence determinations under the Academy's "Applicability Guidelines." App.617; R.Doc.168-3, at 19. And Altman

37

testified that the actuaries he knows use ASOP 27 when evaluating whether a plan provides actuarially equivalent benefits.[16] App.883-84; R.Doc.168-4, at 248-49.

ASOP 27 guides actuaries' selection of a discount-rate assumption. It instructs actuaries to select a "reasonable" assumption, with the primary factor being "the purpose of the measurement." Add.84; App.1256; R.Doc.189-5, at 18; Add.93; App.621; R.Doc.168-3, at 23. ASOP 27 identifies three common purposes— "Contribution Budgeting," "Defeasance or Settlement," and "Market-Consistent Measurements"—and the appropriate type of discount rate for each. Add.84; App.1256; R.Doc.189-5, at 18. Altman determined the market-consistent-measurements approach "best fits the purpose of selecting a discount rate for generating actuarially equivalent pension benefits."[17] App.621-22; R.Doc.168-3, at 23-24. The standard provides that actuaries may use rates informed "by market yields for a hypothetical bond portfolio whose cash flows reasonably match the pattern of benefits expected to be paid in the future," noting that bond type and quality "may depend on the particular type of market-consistent measurement." Add.84; App.1256; R.Doc.189-5, at 18.

---

[16] The Academy recently combined ASOP Nos. 27 and 35 into a "single assumption standard for pensions." *See* Actuarial Standards Board, *Repeal of Actuarial Standard of Practice No. 35* (June 2024), http://www.actuarialstandards board.org/asops/asop-no-35-documentation-and-disclosure-in-property-and-casualty-insurance-ratemaking-loss-reserving-and-valuations-repealed/.

[17] Section 3.9's other purposes concern plan financing, not benefit calculation.

Appellate Case: 26-1330     Page: 48     Date Filed: 05/01/2026 Entry ID: 5635238

The segment discount rates that the Treasury Department publishes pursuant to IRC §417(e) reflect the actual interest rates yields for high-quality (AA-rated) corporate bonds at various maturities. *See* 89 Fed. Reg. 2127, 2131-32. The IRS determines the single rate that best represents the yield curve covering bonds less than five years old, between five to twenty years old, and over twenty years old. *Id.* The segment rates thus align with ASOP 27's recommended rate type for "market-consistent measurements" because they reflect current market yields on high-quality bonds with "cash flows [that] reasonably match the pattern of benefits to be paid in the future." Add.84; App.1256; R.Doc.189-5, at 18; Add.93; App.621; R.Doc.168-3, at 23. Even Terry acknowledged that the §417(e) segment rates fall within the ASOP 27's "market-consistent" approach. App.473; R.Doc.168-2, at 25.

Altman further explained his use of the §417(e) discount rates, stating that "the use of high-quality bond credit is similar in nature to pension plan credit worthiness." Add.94; App.622; R.Doc.168-3, at 24. AA corporate bonds are the preferred instrument for measuring the value of pension obligations, and Congress codified that preference in §417(e). The Pension Protection Act of 2006, Pub. L. No. 109-280, 120 Stat. 780 (2006), replaced §417(e)'s prior 30-year Treasury rate with the three-segment structure tied to investment-grade (including AA) corporate bond

39

yields.[18] *See* 26 U.S.C. §417(e)(3); 26 C.F.R. §1.417(e)-1(d)(3); *see also* App.809; R.Doc.168-4, at 174 ("IRS uses [417(e) rates] for determining the actuarial equivalent value of lump sums. It sets a minimum.").

Altman's use of a variable discount rate based on corporate bond yields hardly "strays from standard practice among actuaries." Add.64; App.1373; R.Doc.221, at 9. The plan in *Dooley* used a Moody's index of AAA-rated corporate bonds to calculate actuarially equivalent benefits. 797 F.2d at 1449. Likewise, the plan sponsor in *Urlaub* amended its plans to use the §417(e) rates on the advice of its actuary. *Urlaub*, 750 F.Supp.3d at 868. Indeed, Terry opined in *Urlaub* that actuaries "frequently look to the rates of high quality … corporate bonds" to compare the value of different benefit payments.[19] App.1118-1119, R. Doc.189-3, at 170-71.

The district court also expressed concern that Altman "could not recall ever advising a client to use these assumptions in the ECF context." Add.65; App.1374; R.Doc.221, at 10. But Altman was not suggesting that a plan must use §417(e)

---

[18] A 2002 "Public Statement by the Pension Practice Council of the American Academy of Actuaries" explained that Treasury rates no longer reflected annuity prices because Treasury rates had departed from corporate bond rates. *See* Am. Academy of Actuaries, Pension Practice Council, *Alternatives to the 30-Year Treasury Rate*, at 4-5 (July 17, 2002), https://www.actuary.org/wp-content/uploads/2025/05/AAA_17FS_Final.pdf.

[19] Terry also acknowledged that portfolios of U.S. high-quality corporate bonds represent a good approximation of return expectations for pensions. App.547; R.Doc.168-2, at 99.

Appellate Case: 26-1330     Page: 50     Date Filed: 05/01/2026 Entry ID: 5635238

assumptions. Rather, he opined that §417(e) assumptions are "the measure of reasonableness." App. 821; R.Doc. 168-4, at 186.

Indeed, Altman testified that he has advised "adopting factors that *satisfy* 417(e)" and that he has "given that advice over [his] career." App.822; R.Doc.168-4, at 187 (emphasis added); *see also* App.818-19; R.Doc.168-4, at 183-84. Here, Altman delineated two actuarial tasks: (1) assessing the reasonableness of existing ECFs (i.e., the floor) and (2) advising a client about what their ECFs should be (to stay above the floor).[20] In this case, Altman opined on the reasonableness of U.S. Bank's ECFs using the method he employed during his 40-year career. The district court's suggestion that Altman took an anomalous tack is inaccurate.

Relatedly, the district court worried that "Altman's framework would functionally insert into ERISA a legal requirement that plan sponsors update their actuarial assumptions annually." Add.66; App.1375; R.Doc.221, at 11. Not so. ERISA allows plans to use a "variable standard"—in which the assumptions refer to an external index that automatically updates—to calculate actuarially equivalent

---

[20] That Altman does not specifically recall advising a client to incorporate §417(e) factors into its plan reflects the reality that "[m]any of [his] clients offered subsidized early retirement as opposed to punitive early retirement …." App.701; R.Doc.168-4, at 66. In that context, there is no reason to incorporate assumptions at the baseline of reasonableness into the plan.

41

Appellate Case: 26-1330     Page: 51     Date Filed: 05/01/2026 Entry ID: 5635238

early retirement benefits.[21] Rev. Rul. 79-90, 1979-1 C.B. 155; *see, e.g.*, App.1200; R.Doc.189-3, at 252 (discussing CITGO plan's adoption of §417(e) segment rates). Alternatively, a plan may incorporate ECFs slightly more generous than the *exact* baseline in a given year to accommodate any year-over-year fluctuations. *See* App.787; R.Doc.168-4, at 152.

More fundamentally, the district court conflated the purpose of expert testimony with the purpose of a regulatory standard. Rule 702(c) asks whether "the testimony is the product of reliable principles and methods." Nothing in that standard requires expert opinions to double as compliance frameworks for future parties. So long as an expert's testimony "rests upon 'good grounds, based on what is known' it should be tested by the adversary process with competing expert testimony and cross-examination, rather than excluded by the court at the outset." *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014) (quoting *Daubert*, 509 U.S. at 596).

In sum, Rule 702(c) requires only that Altman's methodology reliably assessed whether U.S. Bank's ECFs were reasonable. Altman's use of §417(e)

---

[21] Indeed, the Plan already does so for a different purpose; it uses the Treasury assumptions from the October before a participant's benefit commencement to calculate certain "unmandated" forms of benefit. App.307; R.Doc.168-1, at 104.

42

Appellate Case: 26-1330   Page: 52   Date Filed: 05/01/2026 Entry ID: 5635238

discount rates—based upon actuarial standards and practice, supported by legal and regulatory authority—did just that.

### C. The district court erred in requiring Altman to identify a range of early commencement factors.

The district court further abused its discretion by deciding that actuarial practice required Altman to generate "a range of values that could be actuarially equivalent." Add.69-71; App.1378-80; R.Doc.221, at 14-16. There is no dispute that actuaries assess plan ECFs by comparing them to ECFs they independently calculate to produce actuarially equivalent benefits. App.481; R.Doc.168-2, at 33; Add.68; App.1377; R.Doc.221, at 13. But the district court further decided that, "to assess whether a pension plan's ECFs generate actuarially equivalent benefits, an actuary compares [plan] ECFs to factors generated from *different combinations of mortality and interest rate assumptions*," Add.68; App.1377; R.Doc.221, at 13 (emphasis added), excluding Altman's opinion because he determined actuarial equivalence using the reasonable actuarial assumptions discussed above, *see supra*, Arg. Part II.B, rather than a range of ECFs. The district court described Altman's opinion as "so unconventional as to be unreliable." Add.68; App.1377; R.Doc.221, at 13.

The district court primarily relied on Defendants' actuarial expert for its methodological conclusion. Add.68-70; App.1377-79; R.Doc.221, at 13-15 (citing Terry's Report). But Terry simply stated that "*one* methodology for assessing the reasonableness of [plan] ECFs is to compare the tabular factors to factors that are

43

generated from different combinations of reasonable mortality and interest rate assumptions." App.487; R.Doc.168-2, at 39. Terry did not claim that his method is typical or standard. At most, Terry asserted that, "[w]ithin the actuarial profession, 'reasonableness' is generally understood to represent a range as opposed to a fixed point number." App.468; R.Doc.168-2, at 20. That is true, but it does not follow that the standard way to assess whether ECFs produce actuarially equivalent benefits is to compare them to a range of ECFs, let alone that Altman's method is unreliable.

The only external source that Terry cited in support of his approach—and the only other source that the district court cited beyond Terry's report—is ASOP 1 §2.10.[22] *See* Add.70; App.1379; R.Doc.221, at 15 (citing same). It states: "Because actuarial practice commonly involves the estimation of uncertain events, there will often be a range of reasonable methods and assumptions, and two actuaries could follow a particular ASOP ... and reach different but reasonable results." App.1224; R.Doc.189-4, at 10. But this statement about professional latitude neither describes how any actuaries structure comparative ECF analyses in practice, nor prescribes how they must do so.

---

[22] *See* ASOP 1 § 2.10, *Introductory Actuarial Standard of Practice*, http://www.actuarialstandardsboard.org/asops/introductoryactuarialstandardpractic e/ (last visited Apr. 28, 2026).

Appellate Case: 26-1330     Page: 54     Date Filed: 05/01/2026 Entry ID: 5635238

ASOP 1's general, permissive commentary (and Terry's application of it) do not create a standard of actuarial practice for ECF assessment. Although it is fair to draw from ASOP 1 that more than one set of reasonable assumptions may exist for a present value/ECF calculation, that does not mean that the only actuarially sound way to *assess* the actuarial equivalence of ECFs is to compare them to more than one set of reasonable assumptions. The drafting history of ASOP 27 confirms the point. The 2007 version directed actuaries to "determine the best-estimate range for each economic assumption, and select a specific point from within that range." App.1310; R.Doc.189-13, at 10. In 2013, the Academy deleted that instruction. In its place, the revised standard offers only the permissive observation that "a range of reasonable assumptions may develop both for an individual actuary and across actuarial practice." App.1339; R.Doc.189-14, at 14.

Because any conceivable range would be narrow—specifically, within a few hundredths of one percent (i.e., .0001-.0003)—Altman assessed the Plan's ECFs against ECFs generated from a single, reasonable interest-rate assumption and a single, reasonable mortality assumption. *See* App.713; R.Doc.168-4, at 78 ("I don't deny that another actuary might come at the examination by using a range, but the range should be very narrow for it to be reasonable."); App.741-42; R.Doc.168-4, at 106-07 ("[A]ny reasonable factors ... would be within a few basis points on the interest rate and similar in mortality."). The district court's conclusion that this

45

approach violated some methodological standard reflects nothing more than "its own assessment of the correctness of the expert opinions"—an impermissible basis for exclusion. *Johnson*, 754 F.3d at 562.

Nor does ASOP 1 reflect a principle that independently supports exclusion of Altman's opinions. The district court reasoned that the ECFs calculated by Altman cannot show whether U.S. Bank's ECFs remained within the reasonable range of possibilities each year. Add.68-69; App.1377-78; R.Doc.221, at 13-14. But—again—this emerges from the court's misunderstanding of Altman's objective. Rather than determining a range of ECFs from which U.S. Bank could have chosen, Altman selected assumptions to identify the reasonable baseline for ECFs in each relevant year. App.821; R.Doc.168-4, at 186 (describing selected assumptions as "measure of reasonableness"); App.786; R.Doc.168-4, at 151 ("the plan needs to provide benefits that are at least as generous as the benefits provided by 417(e)"); App.793; R.Doc.168-4, at 158 (opining that ECFs calculated by 417(e) rates reflect "the minimum [plan sponsors] need to do to be compliant").

As explained above, §417(e) discount rates are helpful for setting a baseline of reasonableness for calculating actuarial equivalence across pension benefits. Altman followed ASOP 27 and testified that all actuaries he knows look to ASOP 27 "to evaluate retirement factors." App.883-84; R.Doc.168-4, at 248-49. Altman's selection of the October §417(e) rates—the same method used by the Plan to

46

calculate a portion of Plaintiffs Pettenger's and Snead's annuities, App.628; R.Doc.168-3, at 30—was unbiased and logical. App.815; R.Doc.168-4, at 180; *see also Urlaub v. CITGO Petroleum Corp.*, 348 F.R.D. 319, 327 (N.D. Ill. 2024) (reasoning that plaintiffs, through Altman, provided a "logical reason" when selecting §417(e) rates because "defendants' plans have used these parameters"). Neither Altman nor Terry has ever advised a plan to use—or encountered a plan that did use—§417(e) rates from multiple months. App.932-33; R.Doc.168-4, at 297-98; App.1199-1200; R.Doc.189-3, at 251-52.

Altman's method of identifying assumptions to produce baseline ECFs is also reflected in his mortality table assumption. Following ASOP 35, Altman used mortality tables published specifically for retirement-plan calculations, which the IRS requires plans to use to calculate various forms of benefit. Add.94-95; App.622-23; R.Doc.168-3, at 24-25; Add.90-92; App.618-20; R.Doc.168-3, at 20-22. And, despite evidence suggesting that 60% of plan participants were female, Altman "conservatively selected a blend of 50% male/50% female mortality," which generated lower ECFs. Add.95; App.623; R.Doc.168-3, at 25.

At bottom, the district court excluded Altman not because his method was unreliable, but because it preferred Terry's. That is a merits judgment, not a gatekeeping one. It was, therefore, error for the district court to reject his expert testimony under *Daubert. See Johnson*, 754 F.3d at 562.

Appellate Case: 26-1330     Page: 57     Date Filed: 05/01/2026 Entry ID: 5635238

### III. The district court erred by granting summary judgment.

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is inappropriate where, as here, "the record permits reasonable minds to draw conflicting inferences about a material fact." *Riedl v. Gen. Am. Life Ins. Co.*, 248 F.3d 753, 756 (8th Cir. 2001).

ERISA requires that early retirement benefits be the actuarial equivalent of a participant's normal-retirement benefit. As shown in Argument Part I, that demands reasonable underlying assumptions. And as detailed in Part II, Plaintiffs' expert, Ian Altman, calculated the baseline ECFs that reasonable assumptions produce and concluded that the Plan's ECFs fall well below that baseline in every year at issue. *See* Add.96-97; App.624-25; R.Doc.168-3, at 26-27. That evidence—reasonable assumptions, correctly applied, yielding a material gap between what the Plan pays and what ERISA requires—reflects a genuine dispute of material fact.

The district court's summary judgment ruling rests on two errors. First, the court held that §1054(c)(3)'s actuarial-equivalence requirement imposes no constraint on the reasonableness of a plan's underlying assumptions. Add.74-76; App.1383-85; R.Doc.221, at 19-21. That holding is wrong for the reasons explained in Argument Part I. Second, even if Plaintiffs are correct that there is a reasonableness requirement, the district court held that Plaintiffs lacked sufficient

48

evidence that the Plan's ECFs were not consistent with reasonable actuarial assumptions because the court had excluded Altman's testimony. Add.77; App.1386; R.Doc.221, at 22. That holding falls with the *Daubert* ruling addressed in Part II. Because §1054(c)(3) requires the use of reasonable actuarial assumptions and Altman's expert testimony that U.S. Bank's ECFs violated this requirement should have been admitted, it necessarily follows that the district court's grant of summary judgment was in error.

### A. The Plan's early commencement factors must be consistent with reasonable actuarial assumptions.

"At the motion-to-dismiss stage," the district court "used various tools of statutory interpretation to conclude that a reasonableness requirement is consistent with ERISA's structure and purpose." Add.74; App.1383; R.Doc.221, at 19 (quoting *Adams*, 635 F.Supp.3d at 753-54). But in granting summary judgment, the court eschewed its construction of the statute in favor of the defense expert's interpretation. *See* Add.75; App.1384; R.Doc.221, at 20.

The district court observed that, "where Congress has used technical words or terms of art, it is proper to explain them by reference to the art or science to which they are appropriate." Add.74; App.1383; R.Doc.221, at 19 (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 201 (1974)). But *Corning* does not support adopting a party's expert's interpretation as evidence of industry meaning. In *Corning*, the Supreme Court's legislative history review illuminated (1) an objective

49

Appellate Case: 26-1330     Page: 59     Date Filed: 05/01/2026 Entry ID: 5635238

industry definition and (2) Congress's choice to adopt this well-defined term. 417 U.S. at 199-202.

Here, the district court did not rely on an industry definition. It simply deferred to Terry's definition, in ¶65 of his report, which itself cited nothing. *See* Add.75; App.1384; R.Doc.221, at 20. The district court stated that Terry's definition "accords" with *Stephens* and 26 C.F.R. §1.401(a)(4)-12. Add.75; App.1384; R.Doc.221, at 20. But even the industry publication *Stephens* relied upon recognized that actuarial-equivalence assumptions "must be reviewed and modified." Schwartzman & Garfield, *supra* note 9, at 11. In deciding that "underlying assumptions need not be reasonable in order to generate actuarially equivalent benefits," Add.75; App.1384; R.Doc.221, at 20, the district court ignored decades of actuarial professional standards. *See supra*, Arg. Part I.

Moreover, the district court's interpretation reduces ERISA's actuarial-equivalence obligation into a weak reminder that—whatever assumptions you choose—you must do the math correctly. So, when a plan uses unexplained ECFs, actuarial equivalence is completely unverifiable. The district court acknowledged as much when it stated that "actuarial equivalence is properly assessed in reference to those assumptions and conversion factors stated in the plan document." Add.76; App.1385; R.Doc.221, at 21. Because the Plan only lists a chart of ECFs, and does not identify the assumptions used to generate them, the district court simply accepted

50

that those ECFs produce actuarially equivalent benefits. Add.76; App.1385; R.Doc.221, at 21 (citing Plan Document §2.1.2). That approach does not give meaning to the term "actuarial equivalent;" it allows employers to define the term however they choose, a proposition courts have soundly rejected. *See*, *e.g.*, *Laurent*, 794 F.3d at 286.

### B. The evidence shows that the Plan's early commencement factors are not consistent with reasonable actuarial assumptions.

Even if actuarial-equivalence calculations must employ reasonable assumptions, the district court concluded that its order excluding Plaintiffs' expert extinguished any genuine dispute of material fact. But with Altman's testimony admitted—as it should have been—the case for denying summary judgment is straightforward. Plaintiffs offer expert testimony from a Fellow of the Society of Actuaries with forty years of experience that the Plan's ECFs are not consistent with reasonable actuarial assumptions. *See* App.603, 605; R.Doc.168-3, at 5, 7.

The district court held otherwise by crediting Terry's contrary testimony that the Plan's ECFs fall within a range generated from "benchmarks" of his choosing. Add.77-78; App.1386-87; R.Doc.221, at 22-23; *see also* Add.80; App.1389; R.Doc.221, at 25 ("The Plan's ECFs are all within a range of reduction factors that generate actuarially equivalent retirement benefits." (citing Terry Rep. ¶¶162-63)). But on summary judgment, a court may not weigh competing expert opinions or resolve credibility disputes between them. *Arkwright Mut. Ins. Co. v. Gwinner Oil,*

Appellate Case: 26-1330    Page: 61    Date Filed: 05/01/2026 Entry ID: 5635238

*Inc.*, 125 F.3d 1176, 1183 (8th Cir. 1997) ("Questions of an expert's credibility and the weight accorded to his testimony are ultimately for the trier of fact to determine.").

Instead, Plaintiffs need only offer testimony that, if credited, would permit a reasonable factfinder to find for Plaintiffs. *Anderson*, 477 U.S. at 248. Altman did exactly that: he opined that the §417(e) assumptions for each year represent the appropriate benchmark for actuarial equivalence and observed that his own calculations produce ECFs dramatically different from the Plan's. *See supra*, Arg. Part II.B. He further testified that, although a range of reasonable assumptions may exist, that range is narrow and not inclusive of the combinations of assumptions Terry selected. *See* App.712-13; R.Doc.168-4, at 77-78. A reasonable factfinder could credit Altman's testimony, conclude that Terry's assumptions and resulting ECFs fall outside any professionally defensible range, and find for Plaintiffs.

The district court insisted that even if actuarial-equivalence calculations must employ reasonable assumptions, and even if it admitted Altman's testimony, a factfinder still could not reasonably find for the Plaintiffs. Add.79; App.1388; R.Doc.221, at 24. Not so. The district court faulted Altman for not evaluating the Plan's underlying assumptions. Add.80; App.1389; R.Doc.221, at 25. But the Plan's assumptions—that is, any assumptions used to generate the Plan's ECFs—are unknown. *See supra*, Stmt. of Case Part II.B. Thus, neither expert can directly assess

52

the reasonableness of the Plan's undisclosed assumptions. They can only compare the Plan's ECFs to ECFs generated from assumptions that are reasonable.

The district court distinguished *Urlaub*, in which the court found that Altman's testimony established a genuine dispute regarding "whether the defendants' ultimate conversion factor was reasonable," 750 F.Supp.3d at 875-76, by insisting that Altman failed here "to rebut the Plan or Terry's report," Add.81; App.1390; R.Doc.221, at 26. That is not correct. As in *Urlaub*, Altman disputed Terry's opinions regarding which assumptions were reasonable. *See* App.711; R.Doc.168-4, at 76. For example, Altman testified that Terry's method of selecting a discount rate, which used the plan's asset-return rate, was not appropriate for determining actuarial equivalence. App.882; R.Doc.168-4, at 247. Altman also chose a different mortality source, looking to SOA-published tables, *see* App.609-10; R.Doc.168-3, at 11-12, not CDC tables (which fell outside Altman's "Relevant Assumption Universe for Mortality"), *see* App.618-19, R.Doc.168-3, at 20-21. Although Terry consulted the SOA's Pri-2012 table, he used the "headcount-weight version," which is different from the "amounts-weighted" version that Treasury adopted, is appropriately used in actuarial-equivalence calculations, and Altman selected. App.1088; R.Doc.189-3, at 139:12-20; *see supra* note 3.

In denying summary judgment, the *Urlaub* court also relied upon Altman's opinion that "plaintiffs' payments were lower than they would have been even if the

53

defendants had used the most 'conservative' reasonable conversion rate." 750 F.Supp.3d at 875-76. Likewise, here, Altman testified that "the plan needs to provide benefits that are at least as generous as the benefits provided by 417(e)," App.786; R.Doc.168-4, at 151, and showed in his report that the plan does not, Add.94-98; App.622-26; R.Doc.168-3, at 24-28. The *Urlaub* court declined to "credit one expert's opinion over another at the summary judgment stage." 750 F.Supp.3d at 876. The district court here should have done the same.

### C. Defendants' failure to use reasonable actuarial assumptions also violates their fiduciary duties under ERISA.

In their second cause of action, Plaintiffs alleged that Defendants' failure to utilize reasonable actuarial assumptions in calculating early retirement benefits violated their fiduciary duties under ERISA. App.57-60; R.Doc.1, at 28-31. Because the district court found (erroneously) no violation of §1054(c)(3), it granted summary judgment on the fiduciary duty claim as well. Add.82; App.1391; R.Doc.221, at 27. For the same reasons discussed above, therefore, the district court's ruling on the fiduciary duty claim should also be reversed by this Court.

## IV. The district court erred by denying class certification.

Because the Plan applied the same ECF table to calculate early retirement benefits for every Part B participant in the same way, *see* App.307; R.Doc.168-1, at 104, many U.S. Bank retirees did not receive an early retirement benefit that was the actuarial equivalent of the benefit they would have received had they retired at

54

age 65. Accordingly, Plaintiffs sought to vindicate those retirees' rights through a class action. *See* App.93; R.Doc.84, at 1. The intersection of legacy plans, however, introduced complexity. ERISA ties actuarial equivalence to the participant's accrued benefit. *See* 29 U.S.C. §1054(c)(3). Part B benefits accrue as an SLA for all class members, but participants who accrued Part A benefits under the legacy Firstar Plan accrued them in the form of a ten-year certain and life annuity. [23] App.491; R.Doc.168-2, at 43.

Plaintiffs sought to certify a class that included participants with Part A Firstar benefits (as well as Part B benefits), reasoning that the SLA could be used as the §1054(c)(3) comparator for both, but Plaintiffs "alternatively asked the Court to amend the class definition to exclude Firstar participants if the Court took issue with their inclusion." [24] Add.26; App.167; R.Doc.199, at 7. Plaintiffs renewed that alternative request in their reply brief, and they reiterated it at oral argument. Add.26-27; App.167-68, R.Doc.199, at 7-8.

Although Plaintiffs' alternative request for a narrower class excluding Part A Firstar participants was before the district court at every stage of class-certification

---

[23] A "10-year certain and life annuity" is an annuity form under which the retiree receives periodic payments for life, with a minimum payment term of ten years.

[24] Even with Firstar Part A recipients excluded, the class would contain in excess of 1,600 members, easily satisfying Rule 23's numerosity requirement, as the Magistrate Judge subsequently found. Add.38; App.179; R.Doc.199, at 19.

55

briefing, the district court did not address it. Instead, the district court denied certification on the grounds that the inclusion of Part A Firstar participants defeated commonality and typicality. Add.11-19; App.150-58; R.Doc.173, at 11-19. Plaintiffs thus moved for leave to file a renewed motion for class certification that excluded Part A Firstar participants from the class definition. *See* App.159; R.Doc.178, at 1.

Magistrate Judge Brisbois granted Plaintiffs' motion for leave in a report and recommendation urging the district court to certify the narrowed class. Add.54; App.195; R.Doc.199, at 35. As Magistrate Judge Brisbois correctly observed, the district court's commonality and typicality findings "applied only to Part A Firstar participants and not those participants receiving benefits under the other portions of the Plan." Add.29; App.170; R.Doc.199, at 10. The magistrate judge accordingly found that the narrowed class satisfies Rule 23(a)'s commonality and typicality requirements. Add.39-41; App.180-82; R.Doc.199, at 20-22.

Rule 23(c)(1)(C) vests district courts with broad authority to alter or amend class certification orders before final judgment, and that authority "extends to requests ... to reconsider a prior class certification denial." *Cody v. City of St. Louis*, 103 F.4th 523, 529 (8th Cir. 2024). On remand, the district court should be instructed to address the merits of Plaintiffs' renewed motion for class certification with respect to the narrowed class excluding Part A Firstar participants.

56

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's order granting Defendants' motions to exclude expert testimony and for summary judgment and remand the case for further proceedings, including consideration of the merits of Plaintiffs' renewed motion for class certification.

Dated: April 30, 2026

Louis M. Bograd
MOTLEY RICE LLC
401 9th Street, N.W., Ste. 630
Washington, D.C. 20004
Telephone: (202) 232-5504
lbograd@motleyrice.com

Respectfully submitted,

**MOTLEY RICE LLC**

*/s/ Mathew P. Jasinski*
Mathew P. Jasinski
MOTLEY RICE LLC
20 Church St., 17th Floor
Hartford, CT  06103
Telephone: (860) 882-1681
mjasinski@motleyrice.com

*Counsel for Plaintiffs-Appellants*

57

# CERTIFICATE OF COMPLIANCE

Undersigned counsel certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,499 words, excluding the parts of the brief exempted by the Federal Rule of Appellate Procedure 32(f).

Undersigned counsel certifies that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionately spaced 14-point Times New Roman typeface using Microsoft Word 365.

Pursuant to Eighth Circuit Local Rule 28A(h), undersigned counsel further certifies that this brief and its addendum have been scanned for viruses and that they are virus-free.

Dated: April 30, 2026

Respectfully submitted,

**MOTLEY RICE LLC**

/s/ *Mathew P. Jasinski*
Mathew P. Jasinski

*Attorney for Plaintiffs-Appellants*

58

Appellate Case: 26-1330    Page: 68    Date Filed: 05/01/2026 Entry ID: 5635238

# CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2026, I served a copy of Plaintiffs-Appellants' Opening Brief on counsel for Defendants-Appellees via the Court's CM/ECF system.

Dated: April 30, 2026

Respectfully submitted,

**MOTLEY RICE LLC**

/s/ *Mathew P. Jasinski*
Mathew P. Jasinski

*Attorney for Plaintiffs-Appellants*

59

Appellate Case: 26-1330    Page: 69    Date Filed: 05/01/2026 Entry ID: 5635238